IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TYREE McCLELLAN,<br><br>    Plaintiff,<br><br>    v.<br><br>TYRELL A. WILSON, SR.,<br>ASSISTANT WARDEN,<br>CHIEF OF SECURITY VIRGIEL<br>HATCHER,<br>LT. ANTONIO CLARKE,<br>LT. ANTHONY WRIGHT,<br>CO II JUSTEIN CHAVIS,<br>CO II JANE DOE,<br><br>    Defendants. | Civil Action No.:  JRR-23-2950 |

**MEMORANDUM OPINION**

Pending before the court is the second Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed on behalf of Defendants Warden Tyrell A. Wilson, Sr., Chief of Security Virgiel Hatcher, Lt. Antonio Clarke, Lt. Anthony Wright, Officer Justein Chavis,[1] and Officer Jane Doe.  ECF No. 25.  Plaintiff Tyree McClellan opposes the motion.  ECF Nos. 28, 30.  No hearing is required.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons that follow, Defendants' motion, construed as one for summary judgment, shall be granted and judgment entered in their favor.

**BACKGROUND**

Except where indicated, the following facts are undisputed.  At all times relevant to the Complaint, self-represented Plaintiff Tyree McClellan was incarcerated at the Baltimore Central Booking and Intake Center ("BCBIC") as a pre-trial detainee.  On August 16, 2023, he was moved from "4 South" by Sgt. A. Adeyemi to the central bookings floor, cell 2NO6.  ECF No. 1 at 1.

---

[1] The Clerk will be directed to amend Defendants' names on the docket to reflect their full and correct spelling.

Approximately three hours later, Officer Justein Chavis, Officer Jane Doe, and a Keefe Commissary employee delivered his commissary order to his cell. *Id*. To get the cell door opened wide enough to sign for and receive the order, McClellan states that he had to push the door open. *Id*. After the door was opened, McClellan told both of the officers who were present that he needed to talk to a sergeant or a lieutenant. *Id*. After Officer Jane Doe asked McClellan if he meant that he was not going to return to his cell, McClellan confirmed he would not return to the cell until he spoke to someone to find out "how much longer [he] had to stay on the floor." *Id*. The officer cautioned McClellan that he would not want to have Lt. Clarke come to the area to talk to him. *Id*. McClellan assured her that he did, in fact, want Lt. Clarke to come to the area. *Id*.

McClellan states that Officer Doe's cautionary statement told him that Lt. Clarke was an officer with a reputation, forecasting how the encounter would end before it started. ECF No. 1 at 2. McClellan alleges that Lt. Clarke "walks around with goggles" – meaning "he sprays the mace often." *Id*. He also alleges that the type of mace Lt. Clarke carried is not mace intended for use against people. *Id*.

McClellan recalls that Lt. Clarke approached in an alarming manner that made him uncomfortable and stated, "go the hell in we ain't doing no talking tonight." *Id*. McClellan responded, "all I want to know is when I will be moved to another tier you [sic] acting just like the reason I was moved . . . got no respect but want respect." *Id*. At this point, Lt. Clarke turned to tell another officer to get him a mask. *Id*. McClellan told Officer Chavis that all he was trying to do is to "get upstairs" but Chavis responded that McClellan should return to the cell or he would get maced. *Id*.

According to McClellan, he did not react to the aggressive actions being taken by the officers, which irritated Lt. Clarke. ECF No. 1 at 2. McClellan claims that Lt. Clarke grabbed

2

him by his shirt and pushed him against the wall. *Id*. McClellan maintains he still did not react to the aggression against him but simply asked why Lt. Clarke was putting his hands on him. *Id*. Lt. Clarke then backed away from McClellan and sprayed mace, hitting him on the left side of his face. *Id*. McClellan closed his eyes and turned his back, raising his hands up to indicate he was not presenting a threat, but he was hit again with the mace. *Id*. at 2-3. Officer Chavis then gave McClellan an order to return to his cell. McClellan complied but claims he had to feel his way into the cell because he had mace in his eyes and could not open them. *Id*. at 3. He claims he should have immediately been taken to medical but was sent into his cell instead. *Id.* Once he was inside the cell, he had trouble navigating through the small cell and was having difficulty breathing because he has asthma. *Id*.

When McClellan yelled that he could not breathe and that he had asthma, he claims he was ignored and "mocked by the shift supervisor Lt. Wright." ECF No. 1 at 3. He explains that Lt. Wright told him to "stop crying like a bitch" even though Wright was aware of McClellan's asthma. *Id*. McClellan was left in the holding cell for about ten to twenty minutes. *Id*. at 4. He describes "feeling around" to find his sheet, which he put into the toilet to flood his cell so that he would be removed from the cell. *Id*. While he waited, McClellan let water from the sink run over his eyes so he could see again. *Id*. Officers returned to take McClellan to a nurse; after he was seen, he was put into a cell without running water. *Id*. He states he was not given a shower when he was seen by the nurse and was never taken to the "real" medical department. *Id*.

McClellan claims that mace is used with inappropriate frequency at BCBIC -- to break the will of inmates. *Id*. at 5. McClellan claims, that as a result, BCBIC a dangerous institution. He names the Warden, the Assistant Warden, and the Chief of Security as Defendants, because, he alleges, they knew about this practice, the practice of officers not wearing name tags, and the

practice of officers covering for each other. *Id*. As a result of the incident described, McClellan states that he became suicidal and his PTSD was exacerbated. *Id*.

Lt. Clarke prepared a Use of Force Report on the date of the incident and explained his actions as follows:

> On 8/16/23 at approximately 8:20 p.m. Lt. Clarke was called to cell 2C06 by Officer Boskett because the detainee in cell 2n 06 forced his way out of his cell after his cell was opened for him to receive[] his commissary. Lt. Clarke and Officer Chavis gave detainee Tyree McClellan #3504645 several orders to go back into the cell but he adamantly refused them all. Detainee McClellan continued with his defiance by saying, "I've been to North Branch and everywhere else, this shit doesn't faze me." Lt. Clarke then tried holding detainee McClellan by his shirt sleeve in order to put him in his cell, but he pulled away from him. At this time, Officer Chavis saw what happened, used his mace and sprayed him in his facial area. Detainee McClellan was then taken to medical to be evaluated for exposure to mace without further incident.

ECF No. 27 at 4. McClellan was returned to his cell at approximately 8:25 p.m. ECF No. 25-2 at 3, ¶ 10. Lt. Clarke adds in his declaration that it is a common procedure to have detainees wait to calm down before they are escorted to the medical unit after pepper spray is deployed. *Id*. at ¶ 11. He explains that the delay allows for their heart rate to return to normal so that an accurate reading can be obtained by medical professionals. *Id*. Lt. Wright was overseeing the work crew on the unit and observed water on the floor that was coming from inside McClellan's cell. *Id*. at ¶ 13. McClellan was escorted to medical at 8:38 p.m. without incident. *Id*. at ¶ 14.

Officer Justein Chavis provides a declaration describing the incident with McClellan on August 16, 2023. ECF No. 25-3. Chavis recalls assisting the commissary officer in giving McClellan his commissary order at approximately 8:20 p.m. *Id*. at 2, ¶ 6. After McClellan signed for the order, he forced his way out of the cell and refused several orders given by Officer Chavis to return to the cell and instead requested that Chavis call a supervisor. *Id*. at ¶¶ 6, 7. Lt. Clarke is the supervisor who reported to the area in response to the request made for a supervisor. *Id*. at

4

¶ 8. Because McClellan continued to refuse all orders, continued to use profanities, and "quickly turned away and stopped himself from going into the cell," Chavis deployed pepper spray in McClellan's face. *Id*. at ¶¶ 8, 9. McClellan continued to refuse direct orders, so another burst of pepper spray was deployed. *Id*. at ¶ 10. Chavis also recalls that McClellan returned to his cell at approximately 8:25 p.m. without further incident and the doors to his cell were closed. *Id*. at ¶ 11. Chavis adds that McClellan was monitored by correctional officers while he was in his cell before being taken to the medical unit. *Id*. at ¶ 13. Chavis attests that McClellan was taken to the medical unit at approximately 8:38 p.m. *Id*. at ¶ 15.

Lt. Wright denies being present during the use of force incident and explains he was assigned to supervise a work crew on August 16, 2023. ECF No. 25-4 at 2, ¶¶ 5, 6, 7. Wright confirms the account of the other officers; he observed water coming from McClellan's cell and oversaw the working crew as they cleaned up the water. *Id*. at ¶ 8. He observed McClellan being escorted to medical shortly thereafter. *Id*. at ¶ 9.

Captain Terrie Thomas investigated the August 16, 2023, incident involving McClellan. ECF No. 25-5 at 1-2, ¶¶ 1, 5. Capt. Thomas' investigation included review of the Use of Force reports prepared by Lt. Clarke and Officer Chavis, photographs,[2] and the video surveillance. *Id*. at ¶ 6. From that review of the evidence, Thomas determined that McClellan refused several direct orders to return to his assigned cell, prompting "correctional staff" to spray him "with pepper spray to get him to comply with the direct order." *Id*. at ¶ 7. Thomas notes that McClellan was seen by medical staff for chemical exposure, where it was noted that he was "'alert and oriented, agitated, denied any distress or discomfort, vital signs stable and WNL.'" *Id*. at ¶ 9; *see also* ECF No. 27 at 17. McClellan refused to be interviewed or submit a statement for the investigation. ECF No.

---

[2] Photographs taken of Clarke, Chavis and McClellan are included in the record before the Court. *See* ECF No. 27 at 8 (Chavis), 11 (Clarke), and 14-15 (McClellan).

25-5 at 3, ¶ 10. In Thomas' view, staff used force that was "in accordance with the Department's Use of Force Manual." *Id*. at ¶ 11.

McClellan received a notice of infraction for disobeying an order (Rule 316), being in an unauthorized location (Rule 402), demonstrating disrespect or using vulgar language (Rule 410), participating in a disruptive act (Rule 100), and making threats that include use of physical harm to property or individuals (Rule 104). ECF No. 25-5 at 3, ¶ 12, ECF No. 27 at 18. On August 24, 2023, McClellan accepted a plea agreement whereby he pleaded guilty to all rule violations with the exception of Rule 104 and waived his right to a hearing. ECF No. 25-5 at ¶ 13. He was sanctioned to 30 days loss of visits and 30 days loss of commissary effective August 16, 2023. *Id*.; *see also* ECF No. 25-9.

McClellan does not deny that he refused orders to return to his cell; instead, he states that he was not threatening anyone and only wanted an answer to his question. ECF No. 28 at 6. He suggests that, rather than resort to using mace, Lt. Clarke could have answered his question to de-escalate the situation, even if the answer was a lie. *Id*. McClellan insists that Defendants are lying about the underlying facts and states that he believes counsel is asking for exhibits to be sealed because "they don't want the truth to come out."[3] *Id*. at 2. He points out that the photograph of him shows that the mace stained his jail-issued shirt, while Defendants claim they "only maced [his] facial area and a reasonable amount [was] deployed." *Id*. at 2-3. McClellan also relies on what he contends is a discrepancy between Chavis' written incident report and the Notice of Infraction. *Id*. at 4-5. In his view, this discrepancy illustrates the lengths to which Captain Thomas and the other Defendants are willing to go to "cover up each other's irresponsible behavior." *Id*. at 5.

---

[3] The Motion to Seal (ECF No. 24) lists confidentiality of arrest records, criminal history, and confidentiality of McClellan's medical records as reasons to seal some exhibits. The motion shall be granted.

Although Defendants provide a description of the content of the video surveillance, they have not filed a copy of the video surveillance with the Court despite being asked to do so. As such, their description of what occurred on the video surveillance will not be considered for purposes of this opinion.

## STANDARD OF REVIEW

### A.     Motion to Dismiss

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The complaint, however, does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555.  Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563.  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570).[4]  "A claim has facial plausibility when the plaintiff pleads factual

---

[4] Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### B.   Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because McClellan is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That notwithstanding, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## DISCUSSION

### A.  Exhaustion of Administrative Remedies

Defendants raise the affirmative defense[5] that McClellan failed to exhaust his administrative remedies. If McClellan's claim has not been properly presented through the administrative remedy procedure, it must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Custis v. Davis*, 851 F.3d 358, 361 (4th Cir. 2017).

---

[5] Defendants assert that McClellan does not mention anything about exhausting administrative remedies in his Complaint. ECF No. 25-1 at 10. But McClellan is not required to plead exhaustion; it is an affirmative defense to be pled and proven by Defendants.

Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, 578 U.S. 632, 639 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'… normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he…PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 635. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 636. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself

11

of it." *Moore v. Bennette,* 517 F.3d 717, 725 (4th Cir. 2008), *see also Younger v. Crowder*, 79 F.4th 373, 380 (4th Cir. 2023) (plaintiff did not fail to exhaust administrative remedies where none were available to him due to ongoing IID investigation).

As the Supreme Court held in *Ross*, an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. at 643-44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

The Division of Pre-Trial Services has its own four-step grievance procedure. ECF No. 25-6 at 2, ¶ 3. The first step is for the detainee to file a Resident Complaint within 15 days of the date of the incident giving rise to the grievance (Step I). *Id*. A response is to be provided within 20 working days. *Id*. Completed complaint forms are submitted to Resident Grievance Office ("RGO") staff. ECF No. 25-11 at 3. "All allegations of assault by staff on residents shall be immediately referred to the Bureau of Special Operations via the Shift Commander." *Id*. For non-medical grievances, the RGO staff determines if the grievance can be investigated by the grievance staff via "directives, post orders, computer records, . . . copies of serious incident reports, logbook reviews, employee or resident interviews, etc." and in cases where the grievance cannot be investigated in that manner, it is referred to the department liaison. *Id*. at 4. When the investigation is complete, the department liaison must provide the RGO staff with the results within 10 days of the receipt of the grievance. *Id*. The RGO staff then reviews the investigation for sufficiency and drafts a response to the resident within five days of receipt of the liaison's response. *Id*. If the resident is released in the interim, the grievance is dismissed unless the grievance concerns monetary reimbursement. *Id*.

The second step in the process is to file a Motion for Grievance Committee (Step II). ECF No. 25-11 at 4. The directives refer the reader to "section A.4 of this directive" for details on submitting a form to RGO staff; however, there is no section A.4 in the directive. The Grievance Committee refers to the Resident Grievance Procedure Committee ("RGPC") which meets "as needed." *Id*. at 5. The RGO director is required to meet with the resident prior to convening an RGPC meeting to inform him or her of the procedure that will be followed during the meeting. *Id*. at ¶ 2. The RGPC hearings are informal and begin with the presentation of the grievance by the grievant, followed by the testimony of other parties and/or witnesses. *Id*. at ¶ 3. After testimony

is completed, the grievant and their representative is asked to leave the room so that the RGPC can deliberate and discuss solutions. *Id*. at ¶ 5. The decision of the RGPC is determined by a majority vote; if it is determined that the grievance is without merit, the RGO staff must send a written explanation of the decision to the resident within 5 working days. *Id*. at ¶¶ 6, 7. If the RGPC finds the grievance meritorious, RGO staff will put the decision in writing, recommending specific relief, and send it to the warden within five working days of the hearing date. *Id*. at ¶ 8. The warden has five working days to affirm, reverse, or modify the committee's decision. *Id*.

The detainee may file a Motion to Appeal to the Warden within three working days of the decision rendered (Step III). ECF No. 25-11 at 5, ¶ H.1. RGO staff must forward a copy of the appeal and all the paperwork to the warden within one working day of receiving the appeal. *Id*. at ¶ H.2. The warden is responsible for reviewing the grievance, the records and the decision, and to "conduct further inquiries if deemed appropriate." *Id*. at ¶ H.3. A written decision on the appeal must be issued within three working days. *Id*. RGO staff, the grievant, and "any parties to the grievance" must be notified of the warden's decision. *Id*. When a Step II decision is not appealed and the grievance as been determined to be meritorious, even in part, the warden is charged with directing appropriate relief and ordering compliance with the order and documentation of same within 10 working days, if possible. *Id*. at 6, ¶ H.4.

To appeal the warden's decision rendered in Step III, the grievant may proceed to Step IV by filing a Motion for Appeal to the Assistant Commissioner of the Division of Pretrial Detention and Services, and forwarding same to RGPC within three working days of the decision issued in Step III.[6] ECF No. 25-11 at 6, ¶ I.1. The Assistant Commissioner then directs RGO staff to inform the grievant of the time, date, and place of the hearing. *Id*. at ¶ I.2. At the conclusion of the

---

[6] The text of the directive reads: "Step II decision." ECF No. 25-11 at 6, ¶ I.1. Given the stated time constraints in the directive, the Court assumes this is a typographical error.

14

hearing, the Assistant Commissioner is required to submit a written notice of the decision to the grievant with copies provided to the RGO staff within 20 working days of the hearing; this decision is final. *Id*. at ¶ I.3. When a grievance is found to be meritorious, the Assistant Commissioner must direct appropriate relief and order compliance and documentation of same within 10 working days. *Id*. at ¶ I.4.

Defendants assert that McClellan filed a Step I grievance regarding the August 16, 2023, incident, which was dismissed on August 25, 2023, but he took no further steps to address his claim through the grievance procedures. ECF No. 25-6 at 2, ¶ 5. McClellan's grievance was dismissed because it was misinterpreted as concerning a disciplinary matter, which may not be addressed through the grievance procedure. ECF No. 25-12. According to the regulations governing the procedure, grievances concerning use of force against detainees by staff are to be referred to the Bureau of Special Operations via the Shift Commander. There is nothing further stated about grievances concerning use of force or what is to take place following the referral. Given the lack of clarity in the directives regarding use of force grievances, the Court finds that there is a dispute of material fact regarding the availability of administrative remedies and declines to dismiss the Complaint for failure to exhaust administrative remedies.

B.    **Fourteenth Amendment Excessive Force**

The Supreme Court held in *Kingsley v. Hendrickson* that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." 576 U.S. 389, 397 (2015). It is enough that a pretrial detainee shows that the "force purposely or knowingly used against him was objectively unreasonable," *id.*, regardless of an officer's state of mind, *id.* at 395 (cited in *Dilworth v. Adams,* 841 F.3d 246, 255 (4th Cir. 2016)). Pursuant to *Kingsley,* this Court must consider whether under the "facts and circumstances" of this particular case, and from the

15

"perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight" the force used against Plaintiff was objectively excessive. *Kingsley*, 576 U.S. at 397.  This Court must also "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.*, quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979) (brackets in original).  The *Kingsley* Court noted that a considerations such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting" may bear on the "reasonableness or unreasonableness of the force used." *Kingsley*, 576 U.S. at 397.

Viewing all reasonable inferences in favor of McClellan's claim, McClellan fails to generate a triable issue on his excessive force claim.  Here, there is no dispute that McClellan's claimed permanent injury is limited to psychological injury; he provides no admissible evidence that any such injury was caused or exacerbated by this incident.  There is no dispute that he was treated within approximately ten to fifteen minutes of the incident (exposure to the chemical agent).  There is further no dispute use of the chemical agent was occasioned by McClellan's refusal to follow orders to return to his cell; and relatedly, that his insistence on obtaining an answer to his question caused delays in the officers fulfilling their assigned duties.

McClellan's question did not bear on his, or another's, safety, health or well-being; rather, it concerned when he would be moved from his then current cell.  The undisputed facts related to this circumstance did not entitle him to ignore lawful orders from correctional officers to return to

his cell.  Further, based on the undisputed evidence, McClellan was objectively provided ample opportunity to comply with the orders given to return to his cell before the chemical agent was deployed.  Lastly, it is undisputed use of pepper spray ceased upon McClellan's compliance with orders to return to his cell.

Having failed to generate a triable issue of fact, for the reasons set forth herein, Defendants are entitled to summary judgment on the excessive force claim.

A separate Order follows.

/S/

April 24, 2025

Julie R. Rubin
United States District Judge